CJ-2003-8770 Harbour

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

MARIE KATHLEEN WEST,                )
                                    )
              Plaintiff,            )     **CJ-2003- 8770**
                                    )
vs.                                 )     Case No. _____
                                    )
THE STATE OF OKLAHOMA,              )
ex rel., THE OFFICE OF THE          )     FILED IN THE DISTRICT COURT
ATTORNEY GENERAL, a                 )     OKLAHOMA COUNTY, OKLA.
constitutional state agency,        )
                                    )     OCT 20 2003
              Defendant.            )
                                          PATRICIA PRESLEY, COURT CLERK
                                          by _____ Deputy

## PETITION

Plaintiff Marie Kathleen West ("West"), for her cause of action against the Defendant The State of Oklahoma, ex rel., The Office of the Attorney General ("State"), states as follows:

### The Parties

1.  Plaintiff is a female citizen of the State of Oklahoma who, at all times material during the period of January 1, 2003 through October 1, 2002, was employed as an attorney by the State of Oklahoma Office of Attorney General in Oklahoma City, Oklahoma. At all times material, Plaintiff resided in Tulsa, Oklahoma.

2.  Defendant State is and was at all times herein mentioned a constitutional agency of the State of Oklahoma, whose primary offices are located in the City of Oklahoma City, Oklahoma County, State of Oklahoma.



EXHIBIT IV

## Factual Allegations

3. On or about October 2001 through January 2002, the Office of Attorney General for the State of Oklahoma was advertising for an attorney with environmental law experience to work for that office and provide legal services to two state agencies and eighty-eight governmental subdivisions, to-wit: the Oklahoma Conservation Commission, the Oklahoma Scenic Rivers Commission, and the Oklahoma Conservation Districts (hereinafter called "Agencies"). Plaintiff was working as an attorney and lived in Tulsa, Oklahoma, and she responded to the advertisements and made application for the position.

4. On January 14, 2002, Plaintiff was employed by the Office of the Attorney General to serve as the attorney under a Legal Services Contract by and between the Attorney General's Office and the Agencies. A copy of this Legal Services Contract between Defendant State and the Oklahoma Conservation Commission for Fiscal Year 2002 is attached hereto as Exhibit "1" and incorporated by reference herein as though set forth in full.

5. Plaintiff sold her home in Tulsa, Oklahoma and moved to Oklahoma City, incurring costs and expenses related to such move based on the promises and description of the job and job offer.

6. Plaintiff gave up other job opportunities in order to take the job as an Assistant Attorney General and work in the area of environmental law and work under the Legal Services Contract.

7. The Legal Services Contract was an agreement wherein the Office of the Attorney General entered into a contract to provide one lawyer for the purpose of legal representation and legal consulting for the Oklahoma Conservation Commission with its

over 200 employees and 5 commissioners, to serve as counsel for the 88 area Conservation Districts in Oklahoma, and to serve as counsel for the Oklahoma Scenic Rivers Commission and its 12 commissioners.

8. Plaintiff was interviewed by Kelly Hunter Burch ("Burch") who represented herself to be the head of the Environmental Protection Unit of the Attorney General's office, and Mike Thralls ("Thralls") who represented himself to be the Executive Director of the Oklahoma Conservation Commission. These individuals explained the position. At no time did these individuals explain the tension or conflicts that existed between the Office of the Attorney General and the Agencies.

9. At no time prior to Plaintiff's employment did Burch explain that the legal representation contemplated by the Office of the Attorney General for Plaintiff to perform would involve unethical conduct.

10. At the interview, Plaintiff was informed about the Legal Services Contract and she was told that the Attorney General's office was looking to hire an attorney to provide legal services and legal consultation to the Agencies only. There was no mention that Plaintiff would perform any other services for the Office of the Attorney General.

11. Plaintiff believed, at that time, based on the representations of Thralls and Burch that the object of the job was to actually provide full and ethical legal services for the Agencies but later learned differently.

12. Under the Legal Services Contract, Exhibit "1" hereto, the position required that three quarters (3/4) of the attorney time of Plaintiff was to be used for the Oklahoma Conservation Commission and the Conservation Districts, and one-quarter (1/4) of the Plaintiff's time was to be used as counsel for the Oklahoma Scenic Rivers Commission.

Plaintiff agreed to accept the position based upon those representations.

13. At the time of Plaintiff's employment, Burch was Plaintiff's immediate supervisor. Her second level supervisor and Burch's supervisor was Tom Gruber ("Gruber") and Gruber's immediate supervisor was Drew Edmondson ("Edmondson"), the Oklahoma State Attorney General.

14. Plaintiff was never shown the Legal Services Contract until months after her employment and was unaware of the specifics.

15. Although Plaintiff made requests on several occasions to see the Legal Services Contract, she was denied the same by Burch.

16. This "split" of Plaintiff's time between the Agencies accounted for 100% of Plaintiff's attorney time and thus no time was left over except as contracted for by the Agencies.

17. Each of the Agencies was paying the Office of the Attorney General under the Legal Services Contract for its share of the 1/4-3/4 split of attorney's time.

18. A plain reading of the Legal Services Contract shows there was no time allotted for the Plaintiff to spend any time at the Attorney General's office or work on matters other than the Agencies' legal work.

19. However, Burch mandated that Plaintiff spend a considerable amount of her time on projects related to the Office of the Attorney General, and unrelated to services to be provided under the contract for the Agencies.

20. When Plaintiff learned of the Agencies "split" and that 100% of her time was to be accounted for under the contract, she questioned the other unrelated work assigned to her by Burch.

21. Plaintiff came to believe that it was unethical for the Office of the Attorney General to mandate that she spend time on issues other than those of the Agencies.

22. Burch wrongfully requested and/or required, as a condition to Plaintiff's continued employment, that Plaintiff spend time on other matters directly for the Office of the Attorney General which Plaintiff believed to be in violation of the Legal Services Contract with the Agencies and instructed Plaintiff not to advise the Agencies of the extra-curricular work and to lie to the Agencies if asked about that work she was performing.

23. Burch's actions caused wrongful tension because of the afore-described conduct that Plaintiff believed to be unethical.

24. Gruber joined Burch in "turning up" the heat on Plaintiff to cause her to quit because he and Burch perceived that Plaintiff would not espouse the Attorney General's "company" line and might not keep ethical violations quiet.

25. During this time, and after, Burch directed Plaintiff to spend time on Burch's projects for the Attorney General's office unrelated to the Agencies.

26. On at least one other occasion, Burch further admonished Plaintiff not to tell the Agency clients about the other time that she was required to spend on non-contract issues.

27. Plaintiff's questioning of duty assignments outside the scope of the Legal Services Contract caused Burch to begin a campaign to harass, intimidate and quiet Plaintiff or make conditions surrounding Plaintiff's job so vexatious to make Plaintiff quit.

28. As her job assignments began to unfold, and to Plaintiff's further surprise and vexations, she became aware, as set out hereinbelow, that the object in the mind of the Office of the Attorney General, was not to actually provide competent legal services to the

Agencies but to essentially spy on those Agencies.

29. This "spying" included conduct which Plaintiff refused including, but not limited to, admonishments by Burch to provide the Agencies with false and misleading information and to provide less than full representation and not advise them of their full legal rights.

30. This "spying" also included a mandate from Burch to advise Burch of everything that was going on to see if there was any illegal activity in the Agencies.

31. Plaintiff began to question what guidelines there were to assist her in identifying conflicts between the Attorney General's office and the clients, between employees of the clients, and between the clients themselves.

32. One of the conflicts was the issue about the Legal Services Contract and whether or not clients knew exactly how Plaintiff's time was being spent.

33. No methodology for resolution of the conflicts was provided to Plaintiff, and because Plaintiff brought up the obvious conflicts, an addendum was added to the Legal Services Contract in about late April or May, 2002. This addendum, attached hereto as Exhibit "2" and incorporated by reference herein as though set forth in full, contained two new provisions that were a direct attempt by Defendants to force Plaintiff to quit raising ethical concerns.

34. The first provision provided that all legal advice no matter how large or small had to be approved by Burch.

35. This meant that Plaintiff was virtually unable to render any competent legal services without prior specific approval from Burch.

36. This provision was included so that no advice would be given by Plaintiff to the Agencies without the knowledge of Plaintiff's supervisors in order that Plaintiff's supervisors could ensure that no reports of obvious unethical conduct would be made to agency clients.

37. The other provision in the addendum mandated that Plaintiff would, herself, be responsible for identifying all areas of conflicts.

38. This provision was also punitive because Plaintiff was attempting to provide ethical legal services to the Agencies and she had to raise the obvious conflict issues. However, the Office of the Attorney General did not want the conflicts raised, or resolved, and it made this task the burden of the Plaintiff, but never provided a mechanism for resolution.

39. Plaintiff was made aware by Burch that she had "rocked the boat" and the clear indication to her was that if she, in fact, raised ethical conflicts, she would be punished.

40. Plaintiff was harassed and intimidated by Burch and Gruber for advising them of the potential conflicts.

41. Plaintiff also found out to her surprise and vexation that the objectives in the mind of the Defendant's employees related to the Legal Services Contract were to have Plaintiff serve as a conduit to put the Agencies in a compromised position in order that Plaintiff's supervisors could better manipulate specific agenda outcomes on any particular matter regardless of whether or not that outcome was the best for the agencies.

42. One of the specific agenda outcomes involved the "poultry negotiations" where Edmondson appointed Burch to head these negotiations.

43.  These "poultry negotiations" involved dealing with the State of Arkansas and the poultry industry producers (largely located in Arkansas) who were targeted as the "source" of pollution in certain Eastern Oklahoma rivers and waters.

44.  Plaintiff's supervisors also put Plaintiff in a position where she was pitted against the Agencies that she was hired to represent and provide legal services.

45.  Plaintiff came to believe that she could not perform her duties as a lawyer because to do what was requested by the Plaintiff's supervisors would constitute ethical violations.

46.  Plaintiff learned after she was hired that Burch had been selected by Edmondson to preside as lead counsel over the negotiations involving the "poultry litigation" and that the resolution of this litigation was of great political importance to Plaintiff's supervisors.

47.  The positions of the Agencies and the Office of the Attorney General were not the same on all points during these "poultry negotiations" although this conflict was known to Defendant.

48.  The Office of the Attorney General, expressed concern that their office craft a resolution of the "poultry litigation" so as to enhance the standing and reputation of Edmondson, and to not let the Agencies get the "spot-light" or credit for the resolution.

49.  Burch advised Plaintiff that her position was to "not let the Agencies do any negotiations behind the Attorney General's Office" and behind her back, and Burch fostered and promoted distrust between the Agencies.

50.  Burch admitted to Plaintiff that her mission was to create distrust and deceit between all state environmental agencies in an effort to prevent them from usurping the

Attorney General's office authority, and resolving the "poultry litigation" because Plaintiff's supervisors desired a successful resolution by their office as a campaign platform plank for Edmondson to run on in the 2002 Attorney General Election.

51. Burch let it be known to Plaintiff that efforts to divide the Agencies so that Edmondson could use his "poultry" solutions as a "platform" for press and election purposes was paramount.

52. Plaintiff believed that the plan for deception for the Agencies was derived for the personal gain and benefit of Edmondson and Plaintiff's supervisors.

53. Plaintiff had to deal with the matter of the Agencies' frustration with the lack of resolution of the poultry issues due to the wrongful conspiracy of the Plaintiff's supervisors on a continual basis and Plaintiff was advised not to tell the Agencies the whole truth.

54. Despite the Legal Services Contract and her obligation to comply with ethical canons and responsibilities, Burch, Gruber and Edmondson never intended that Plaintiff actually provide full and uncompromised legal services to the Agencies.

55. After Plaintiff was employed, she learned that her supervisors desired to collect and obtain voluminous information from the Agencies to use in the "poultry litigation". For instance, on or about March 2002, Plaintiff provided certain documents to Burch from the Oklahoma Conservation Commission. Attached to the document, Plaintiff recited words to the effect that the documents were provided by virtue of an Open Records Request.

56. Burch informed Plaintiff that she, and the Attorney General's office, had an inherent right to every single document of every state agency, whether privileged or non-

privileged, and that an Open Records Request was not needed for Burch to obtain the same.

57. Plaintiff understood Burch's statement to specifically mean that Plaintiff was to provide documents without an Open Records Request so that no paper trail for obtaining those documents would be in existence.

58. Although Plaintiff was new to representing governmental agencies as an attorney, she believed this to be a conflict with her responsibilities in representation of the Agencies and desired to document all records that were produced to the Attorney General's office, and not provide undocumented information.

59. Burch admonished Plaintiff that Plaintiff had better understand who she was working for, the Attorney General's office, and not the Agencies, and that whatever Burch requested must be complied with notwithstanding any other responsibility to the client under professional ethics.

60. Burch advised Plaintiff that Plaintiff was to never provide documents requested by the Attorney General's office in a documented manner again.

61. Plaintiff attempted to express her ethical concerns but was rebuffed by Burch.

62. Plaintiff knew at this time that Burch did not consider her a "team player" and realized that Plaintiff was not ready to do the bidding of the Attorney General's office blindly, and without consideration of the rights of the Agencies Plaintiff represented.

63. In August 2002, Burch directed Plaintiff to lie to the Executive Director of the Oklahoma Conservation Commission if asked whether Plaintiff was working 3/4ths time on legal matters for the Oklahoma Conservation Commission and 1/4th time on the Oklahoma Scenic Rivers Commission legal matters.

64. Later that month, the Administrator of the Oklahoma Scenic Rivers Commission requested an opinion from Plaintiff on the legality of cross-deputization and after Burch was informed of that requested opinion, Burch directed Plaintiff to tell the Administrator that he gave the materials untimely to Plaintiff and that Plaintiff would need more time even though Plaintiff and Burch had already researched that issue and determined that it was lawful.

65. When Plaintiff did as instructed by Burch, the Administrator of the Oklahoma Scenic Rivers Commission became upset with Plaintiff and accused Plaintiff of making him look bad in front of his Board for the purpose of causing the Administrator to be terminated.

66. Plaintiff reported to Burch the Administrator's upset and concerns and Burch replied "Good, the plan worked and Ed will pay even further for going behind my back in the poultry negotiations with Arkansas".

67. As a result of the harassment and hostile work environment Plaintiff's supervisors created, Plaintiff feared for her safety and believed that she was in physical danger as confirmed by Gruber.

68. Because of the lack of action by Gruber and Edmondson to eliminate the harassment and hostile work environment, Plaintiff retained the services of attorneys to assist her in determining the author of the hereinafter described unsigned letter.

69. Despite a request for a copy of the letter being made by Plaintiff's attorneys, Defendant State refused to deliver a copy of the letter and a material witness to those events was pressured to state that all of Plaintiff's allegations were false.

70. After the material witness refused to state that the allegations were false, that employee was terminated from her employment by Defendant State shortly before Christmas 2002.

71. As a result of what Plaintiff perceived to be a conflict of interest and unethical conduct by Plaintiff's supervisors, Plaintiff reported to Mike Thralls, the Administrator of the Oklahoma Conservation Commission, and to Ed Fite, Administrator of the Oklahoma Scenic Rivers Commission, that she was being directed to be adversarial to these Agencies, to not always be truthful to these Agencies, to not log documents from those Agencies turned over to the Attorney General's office, and that her supervisors did not want either of these executive directors involved in the poultry negotiations because her supervisors desired to take credit for the resolution of the poultry litigation in order for Edmondson to use that litigation resolution as a campaign issue and platform. When Burch learned of this speech, she told Plaintiff that if Plaintiff ever spoke to them again about those matters and issues, Plaintiff would be fired.

72. From the very outset of her employment, Plaintiff was being subjected to a hostile work environment as indicated by the hereinafter and previously described acts and conduct of Plaintiff's supervisors.

73. On or about March 14-17, 2002, Plaintiff was required to attend a weekend event called the "AG Academy" in which employees of the Attorney General's office were required to participate. During said event, Burch encouraged another employee to tell Plaintiff about the brutal gang rape of a female. After the gruesome story was told, Burch laughed and stated "The bitch deserved it". Said story was objectionable to Plaintiff inasmuch as it was demeaning to the woman involved and suggested that women deserved

to be brutally attacked by men. Plaintiff objected to Burch and stated "I would think you would be more sympathetic about women and their plight." Burch advised Plaintiff "I don't care about women or their issues."

74. During the same time period, while at the AG Academy, Burch advised Guy Hurst ("Hurst"), the Chief of Litigation, "You know Guy, Marie is nothing but a "prude" and a "tease" – she will not "put out" for the guy she is dating." Burch then insisted that Plaintiff tell the chief of litigation about her personal dating relationship. Plaintiff was humiliated and embarrassed by such remarks and refused to discuss her personal life with Hurst.

75. During the same time period, and while still at the AG Academy, Burch required Plaintiff to stand in front of fellow employees and explain why her underwear had been showing. Plaintiff was further humiliated and embarrassed by Burch's actions.

76. Later, Burch encouraged, ratified and condoned fellow employees participating in and exacerbating the hostile environment. One employee was encouraged to belittle Plaintiff by stating "Marie are you a Dike?" When Plaintiff did not respond, Burch began humiliating Plaintiff in front of others by stating "No one would marry her". Burch encouraged further harassment of Plaintiff by the employee who stated, in front of Burch and others, "Marie you have nothing to look forward to in your life except growing old with a house full of cats". Burch then began belittling Plaintiff because of the way Plaintiff pronounced certain words. As Plaintiff attempted to withdraw from this humiliation, Burch then stated "Why don't you show us your underwear again Marie?" Burch then walked over and without Plaintiff's consent or permission physically touched Plaintiff's person and pulled up Plaintiff's shirt and showed Plaintiff's underwear to the

assembled employees.

77. During the same period, Plaintiff was locked out of the location in which the AG Academy was held. As a result, she was required to sleep in her car. Throughout the following day, Gruber and Burch made embarrassing remarks about Plaintiff sleeping with another employee. The embarrassment of these remarks were exacerbated by Gruber and Burch giving Plaintiff a sham "award" in front of the assembled employees for sleeping in her car with another employee.

78. Throughout the AG Academy, Plaintiff repeatedly expressed objection to the openly hostile treatment she received because of her gender. After objecting to said treatment, and refusing to participate in an openly hostile attitude toward women, Plaintiff was subjected to further and increased hostility.

79. On March 20, 2002, Plaintiff was verbally abused by Burch for following procedure and documenting a request for official records as hereinabove described.

80. Plaintiff was repeatedly denied the same employment conditions, including travel and training, which were given to other employees.

81. Burch repeatedly encouraged and ratified the hostile attitude toward females. On one occasion, a male employee referred to a woman in the Attorney General's office as the "f—ing sweater bitch". This same employee was allowed to inquire about whether Plaintiff had ever "gotten it from behind". This same employee was allowed by Burch to inquire whether certain women's "tits" were fake. Burch further stated that "a whore was giving a blow job to a Scenic River Deputy and they got caught", and then referred to the woman as a "stupid bitch".

82. On or about May 6, 2002, Burch called Plaintiff into her office and asked Plaintiff about advice Plaintiff had given regarding a tax levy issue. This had been an issue which Plaintiff had coordinated with Burch. When Plaintiff reminded Burch that she had, in fact, coordinated with her about this issue, Burch began screaming at Plaintiff "you liar, you liar". Burch then demanded that Plaintiff "beg for forgiveness". Burch further ordered Plaintiff to say that she was sorry or that she would be fired. Plaintiff said she was "sorry" and Burch made her state it over and over again.

83. In order to avoid any further verbal or physical assaults from Burch, Plaintiff asked Burch for Gruber to be a witness to any of their meetings. Burch refused and advised Plaintiff that Gruber "did not like" her and that Plaintiff would be fired if she continued to request Gruber or any other third party to be present.

84. On or about May 9, 2002, Plaintiff met with Gruber about the tax levy issue. Gruber admitted that Plaintiff's advice was correct but stated that Plaintiff had problems taking instructions from her boss, that perception is reality, and that it was his perception that Plaintiff was not well liked at the Attorney General's office. He further stated that Plaintiff's contract would be renegotiated and that everything she did would go through Burch. Gruber then advised Plaintiff if she talked herself out of a job, that it is too bad.

85. After the meeting with Gruber on or about May 9, 2002, Burch told Plaintiff that she has to "beg for forgiveness". Burch made Plaintiff say "I'm sorry" over and over again. Burch then advised Plaintiff "Tom was right you are nothing but a little "snot and no one likes you here". You cannot help that your personality is irritating to everyone". Burch then advised Plaintiff that she was going to go back and tell Gruber that Plaintiff did not take the meeting with Gruber seriously.

86. In an after hours meeting, Burch advised employees that a fellow employee is a "dike". Burch constantly inquired about Plaintiff's sexual history and made fun of Plaintiff for being a "prude". Burch inquired as to why Plaintiff would not have sex on the first date.

87. At other times, Burch violated Plaintiff's privacy and looked at her personal telephone numbers.

88. At other times in the office, Burch belittled Plaintiff as a little rich girl and asked if Plaintiff's "daddy" would buy her something.

89. At other times, Burch referred to women in the office as a "f—ing bitch".

90. Burch physically assaulted and repeatedly intimidated Plaintiff and on one occasion, Burch insisted that Plaintiff walk over to her, open her mouth to prove that Plaintiff had been to the dentist as Plaintiff represented that she had been, and Burch without Plaintiff's permission or consent placed her hand on Plaintiff's face while examining Plaintiff's mouth.

91. On or about September 9, 2002, Burch stood over Plaintiff and screamed at her although Plaintiff begged her to stop yelling at her. Burch told Plaintiff that if she cried again, she would be fired. Burch told Plaintiff that Plaintiff was the problem. When Plaintiff pointed out she had received a good performance evaluation, Burch stated "it has nothing to do with your job performance, it is you".

92. On or about September 11, 2002, Plaintiff complained to Edmondson about the hostile treatment by Burch and asked to be transferred. Plaintiff met with Edmondson because her efforts to reconcile and resolve these issues with Gruber were unsuccessful.

93.     On or about September 16, 2002, Plaintiff was called into Gruber's office and was threatened for having written a letter of complaint directly to Edmondson. Plaintiff again detailed to Gruber the actions taken against her by Burch.

94.     On or about September 19, 2002, Plaintiff was called into the office and advised by Gruber that he had conducted and interviewed almost every member of the unit and he found that the allegations were unsubstantiated and not remotely characteristic of Burch. Gruber indicated that he and Edmondson had agreed not to take any action on Plaintiff's complaints. Gruber then advised Plaintiff that he had received an anonymous letter and provided this letter to Plaintiff. This letter was profane and Gruber considered it to be threatening. This letter stated:

To Marie West:

> Sometimes being a little selfish is prudent, even healthy. You on the other hand are an excessive selfish c__t. Once people learn how insecure and superficial you really are you illuminate like a boring c__t and asshole, epitomizing the phony twit of your being.
>
> Once people get to know who you truly are (and it doesn't take long even though you've developed your game) we all see right through you. You are the white trash you've no doubt always laughed at. It is obvious you are a rich daddy's girl and a spoiled brat (in itself that's not a bad status) you are repulsive for being an egomaniac and a confused b_tch, what most of us around her call "shit"  Was your mother a c_nt too or is this all your originality? You are shallow and no one likes you. You squawk like a fowl and prance like a horse and overall you are an emotional loser-a punk highschooler who passed the exams--big deal, we've all done that and much, much more. We can't stand people like you with no depth or sincerity who come to play this as an ego game for your selfish personal game. Do you have any friends?

This language was similar, in certain respects, to language which Burch had either used or encouraged in the work place.

95. Neither Gruber, nor any other supervisor, took any meaningful action to investigate and identify the source of this letter although Gruber told Plaintiff that she should take the threat letter seriously and to be careful walking to and from her vehicle..

96. Burch advised employees in Plaintiff's office about the letter and its contents and it became an office joke after Gruber directed Plaintiff to continue to work under Burch's supervision.

97. As a result of actions and inactions of Plaintiff's supervisors as aforesaid, Plaintiff feared for her safety and took leave. A complaint about this letter, as well at the treatment by Burch, was communicated to Edmondson who took no meaningful action to remedy or correct the hostile working environment.

98. As a result of the on-going, pervasive and hostile work environment toward women, and the failure to investigate adequately and correct the conduct, Plaintiff was unable to return to work and was constructively discharged.

FIRST CLAIM – Against Defendant State for<br>Failure to Supervise and Retention

99. Plaintiff incorporates by reference Paragraphs 1 through 98 as though set forth in full herein.

100. Defendant State's employees engaged in a campaign to force Plaintiff to leave her job and position because Plaintiff was exposing violations of clearly articulated public policy, *to-wit*: that she was exposing that Burch, with the knowledge and approval of Defendant's employees, Gruber and Edmondson, was lying to public agencies, was practicing deceit and fraud in the course of representation of public agencies, and was attempting to force Plaintiff to violate legal and governmental ethics.

101. Defendant State's employees wanted Plaintiff to quit or leave because she would not condone their wrongful practices, acts and violations of clearly articulated public policy and legal and governmental ethics and would not similarly engage.

102. Likewise, Plaintiff acted consistently with clearly articulated public policy in properly advising and representing the Agencies, and provided, in violation of the admonitions of her supervisor, Burch, and the other employees of Defendant State, correct information and statutory authority to the Agencies.

103. Plaintiff was discharged from her employment with the State Attorney General's office because during the course of Plaintiff's employment with the State Attorney General's office, Plaintiff refused to violate governmental and legal ethics and further refused to lie, deceive, defraud, and otherwise misrepresent the Agencies as their counsel and advisor.

104. Plaintiff's refusal to participate in the illegal and unethical activities and her action in properly advising the Agencies and otherwise acting ethically contrary to the dictates of Defendant State's employees, was a significant factor in the retaliation of Defendant State's employees against Plaintiff which made it impossible for Plaintiff to return to her job and position.

105. Defendant State knew or reasonably should have known of the outrageous, unethical, and unprofessional behavior of Burch, and it negligently failed to supervise and to investigate appropriately the allegations against Burch, failed to take appropriate steps to stop Burch from harassing Plaintiff and other employees, failed to stop Burch from urging her employees to violate governmental and professional ethics, and failed to require her to act in the best interests of the clients and agencies that the Attorney General's office

represented.

106. As a direct result of Defendant State's negligent supervision, investigation, and retention of Burch, as aforesaid, Plaintiff has suffered economic loss, mental anguish and emotional distress, embarrassment, humiliation, loss of professional reputation, loss of enjoyment of life, sleeplessness, and depression, all to her damage in a sum in excess of One Hundred Seventy-Five Thousand Dollars ($175,000.00).

107. Plaintiff filed her written Notice of Tort Claim timely and within one year of the negligent acts of Defendant State, and Plaintiff's claim was deemed denied by the operation of statute, 51 O.S. § 157, on February 2, 2003.

WHEREFORE, Plaintiff prays for judgment against Defendant State of Oklahoma pursuant to the provisions of the Oklahoma Governmental Tort Claims Act as follows:

(1) For her actual damages in a sum of $175,000.00, or the maximum amount as provided by law;

(2) For interest thereon as provided by law;

(3) For her costs; and,

(4) For such other and further relief as the Court deems just and proper.

WARD & GLASS, L.L.P.

Stanley M. Ward, OBA#9351
Woodrow K. Glass, OBA#15690
Scott F. Brockman, OBA#19416
629 24th Avenue S.W.
Norman, Oklahoma 73069
(405) 360-9700    (405) 360-7902 (fax)
ATTORNEYS FOR PLAINTIFF

*JURY TRIAL DEMANDED*
*ATTORNEYS' LIEN CLAIMED*

-20-